In the Matter of ROBERT J. HAIRE, an Attorney, Respondent.

First Department, December 29, 1916.

**Attorney at law disbarred — conversion — speculating with client's money.**

Attorney at law disbarred for speculating in stocks with moneys intrusted to him by a client to be held in trust and for converting the same to his own use.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie*, attorney [*Charles D. Miller* of counsel], for the petitioner.

Respondent, in person.

CLARKE, P. J.:

The respondent was admitted to the bar in May, 1888. Two charges of misconduct were preferred against him by original and supplemental petitions, both of which were referred to one of the official referees. The first, which the learned official referee has found sustained, charged the respondent in brief with the conversion of moneys left with him in trust by one Mary Dale, a client. The charges contained in the supplemental petition have been found by the referee as not sustained because of inability on the part of· the petitioner to produce material witnesses. We confine ourselves, therefore, to the consideration of the evidence in support of the charge contained in the original petition.

In December, 1908, Julia Dale, under the name of Mary Dale, was convicted of abduction in the Court of General Sessions of New York county and sentenced to be imprisoned in the State Prison for women. Prior to the trial she had been released on $3,000 bail, which she furnished in cash. After conviction, and while confined in the City Prison preparatory to her removal to the State Prison, she retained the respondent to appeal her case to the Appellate Division. She paid him $250 in cash to cover disbursements, and on January 2, 1909,

indorsed and delivered to him a check for $3,000, representing her bail, which she had received from the chamberlain of the city of New York after her sentence. In return the respondent gave her the following receipt:

"Received of Julia Dale a check made by the City Chamberlain of the City of New York for the sum of Three Thousand Dollars ($3,000) for collection. Twenty-five hundred dollars ($2,500) of the same I am to hold in trust for said Dale. Five hundred dollars ($500) is to be applied to fees in appealing her case to and arguing the same in the Appellate Division, First Department of the Supreme Court of the State of New York.

"Dated NEW YORK, *January* 2, 1909.

                 "ROBERT J. HAIRE.

"Witness: KATE O'BRIEN, Matron."

In March, 1909, Dale directed the respondent to pay over to Annie Drudy, her attorney in fact, the $2,500 which the respondent had agreed to hold in trust for her. Upon his refusal to do so Drudy brought a summary proceeding in the Supreme Court, New York county, to compel such payment. The respondent in his answering affidavit in said proceeding stated as follows:

"Before she was sentenced, Miss Dale sent for me and retained me to represent her. She said that she wanted me to take an appeal from the judgment of conviction. She paid me $250 on account of my services. A few days later I saw Miss Dale and we discussed the terms of my employment. She told me that she had deposited with the City Chamberlain $3,000 as bail. It was finally agreed that I was to be paid $750 down and an additional $750 at the conclusion of the appeal or appeals, which was to be increased to $1,000 in case I was successful in the Appellate Division. I was to pay the expenses for printing, stenographer's fees, etc. I have already paid the stenographer about $72. It was understood that I am to carry the case to the Court of Appeals if the judgment of conviction is affirmed by the Appellate Division. This agreement was put in writing. A copy thereof is annexed, marked 'A.'"

This exhibit reads as follows:

"NEW YORK, *December* 29, '08.

"I hereby employ R. J. Haire as my attorney to appeal and prosecute the case on appeal from my conviction of the Court of General Sessions to the Appellate Division, and if not successful there to the Court of Appeals, and for his services I agree to pay $750 down and $750 additional at the conclusion of said appeal or appeals, and if he is successful in the Appellate Division he shall receive $1,000 as final fee instead of $750, otherwise he shall pay all expenses and carry the case to the Court of Appeals, and if I receive the $3,000 now in the hands of the Chamberlain, heretofore deposited by my former attorney as bail, said Haire shall have, keep and hold in his hands the sum of $1,000 as security for the final payment as above agreed.  MARY DALE."

On July 2, 1909, the learned justice at Special Term, before whom the motion was heard, rendered the following decision:

"By the respondent's own concession $1,462.50 is due to his client. An order may, therefore, be had directing him to pay over that amount to the petitioner. As to the further sum, which is in dispute, if the petitioner succeeds in an action at law, in establishing her rights thereto, this application may be renewed as to such balance. No costs."

On July 15, 1909, an order was entered directing the respondent to pay the petitioner the sum of $1,462.50 within five days. The respondent served a notice of appeal and applied for a stay pending the appeal, which application was denied August 6, 1909. The appeal was never perfected. On August 20, 1909, the respondent paid over $1,000 and asked and was given until September 20, 1909, to pay the remainder on the ground that he did not have the money. Upon his failure to pay the balance as agreed, Drudy, in November, 1909, made an application to the court to have the respondent punished for contempt. Arrangements were then made whereby the balance of $1,462.50 was paid in two or three installments. The $1,000 to which the respondent asserted claim under the alleged retainer of December 29, 1908, has never been paid.

It thus appears from the uncontroverted evidence that the

respondent was guilty of a conversion of his client's money in the sum of at least $1,462.50, which he has since repaid. And as to the balance of $1,000 which remains unpaid, we are of opinion that the evidence establishes that the respondent had no claim to it. Julia Dale denied that she signed the alleged agreement of December 29, 1908, or that such an agreement was even suggested to her. Aside from the testimony of the respondent, there is an entire absence of any evidence that the agreement between Dale and the respondent contemplated any payment for services in excess of $750. The respondent's receipt of January 2, 1909, is cogent evidence to the contrary. It is highly improbable that the respondent would have signed this receipt, limiting his fees to $500, if Julia Dale had agreed to pay him over double that sum. The respondent testified that a man named George Horn was present when the agreement of December 29, 1908, was signed, but, although he produced a man before the official referee whom he stated to be Horn, he did not call him as a witness.

But irrespective of the genuineness of Julia Dale's signature to this alleged agreement, the respondent's conduct and letters are replete with admissions that he never considered this writing a binding agreement between himself and client. As late as June 3, 1914, he wrote Mrs. Dale: " Your letter of the 1st received. I certainly intend to pay you the $1,000 and interest. Will you please call and see me either Saturday A. M. or Monday A. M."

The respondent repeatedly admitted to Ralph K. Jacobs, an attorney retained by Mrs. Dale, that he owed the balance of $1,000 to her. Her claim having been subsequently pressed by the Legal Aid Society, the respondent admitted to its representative, Henschel, that he owed Mrs. Dale this money and was willing to pay her with interest as soon as possible. Numerous letters passed between the respondent and Henschel, none of which contained any suggestion of a right in the respondent to these moneys, or a denial of the respondent's liability therefor. Henschel succeeded in collecting only twenty-five dollars on account of the claim, which was then sent to one McGee, the chief attorney for the society. The respondent promised McGee to pay the balance in installments,

without asserting any claim to any part of the same as a legal fee, but he paid McGee only fifty dollars on account.

The excuse presented by the respondent for the non-payment of any part of the $2,500 until after the summary proceeding had been brought against him, and for his delay in paying over the $1,462.50 as directed by the court, and for his non-payment of the sum of $1,000, except the small payments on account referred to above, is as follows: The respondent was in business with a man named E. B. Carr, who had access to the respondent's safe combination. In this safe he and Carr had certain stocks of the aggregate value of about $10,000. In the respondent's absence, Carr, by claiming a copartnership with him, took the stock from the safe, together with some $800 in money, and a certificate of deposit which Carr had paid over to him for $1,200 more. As to the check which he received from Mrs. Dale, respondent testified: "When I received these moneys I held the stocks as security, I had held trust funds before, and I got stocks that I considered perfectly safe, buying them outright through a broker; so that the party for whom I held money in trust would get six per cent. * * * I don't remember now whether it was deposited or whether I used it; I substituted securities that I knew to be good."

The respondent testified that the alleged robbery by Carr left him short; that he followed Carr up and recovered part of the stocks from him upon payment of $1,500, which continued to keep him short; and that the robbery was the sole reason for his defaults.

Referring to this excuse on the part of the respondent, the learned official referee in his report says: "But this excuse does not excuse, for the testimony of the respondent as a whole clearly shows that he speculated with his client's money and expected to be able to pay it back out of the stock purchased with it. In his affidavit in opposition to the motion before Judge GIEGERICH, the respondent did not mention the so-called robbery, but gave other reasons for nonpayment. It also appears not to have been mentioned to Ralph H. Jacobs, Mr. Henschel or Mr. McGee. But whether the testimony of the respondent on this point is true or false, the conclusion is unavoidable that the respondent in speculating with his client's money in

the purchase of stocks was guilty of a conversion, and the same result would be reached even if the purchase of the stocks were treated simply as an unauthorized and unlawful investment of trust funds. I feel, therefore, in duty bound to find the respondent guilty, by reason of such conversion, of misconduct in his office of attorney and counsellor at law. In conclusion, it may be stated that the conviction of Mrs. Dale was affirmed by the Appellate Division and that no appeal from the judgment of affirmance was taken to the Court of Appeals."

The respondent urges that the official referee is in error in respect to the respondent's having purchased the stocks referred to with the trust fund. If the evidence is not susceptible of such an inference, the conduct of the respondent is none the less reprehensible, for he has assumed the right to use his client's money for his own purposes, trusting to his ability to repay the same upon demand. This is the excuse usually put forward when unfaithful fiduciaries are called to account. There is no escape from the conclusion that respondent betrayed his trust and converted his client's money to his own use.

Upon the facts shown it clearly appears that the respondent has been guilty of misconduct in his office and is unfit to remain a member of the honorable profession of the law. He is, therefore, disbarred.

LAUGHLIN, DOWLING, SMITH and DAVIS, JJ., concurred.

Respondent disbarred. Order to be settled on notice.